UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

WILLIE JOE DePRIEST, JR.,

        Petitioner,               Case No. 1:07-cv-1290

v.                                     Honorable Janet T. Neff

KENNETH McKEE,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial, Petitioner was convicted in the Berrien County Circuit Court of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, riot, MICH. COMP. LAWS 752.541, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On September 8, 2004, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to respective terms of 300 to 900 months, 120 to 300 months, and two years. In his *pro se* petition, Petitioner raises eight grounds for relief, as follows:

    I.      SHOULD THE CONVICTION BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT PETITIONER COMMITTED THE CRIMES CHARGED?

    II.    WAS PETITIONER'S SENTENCE INVALID BECAUSE IT WAS BASED ON INACCURATE INFORMATION, I.E., IMPROPER SCORING OF THE LEGISLATIVELY IMPOSED SENTENCING GUIDELINES, AND USE OF AN INCORRECT BURDEN OF PROOF; AND, THEREFORE, WERE HIS DUE PROCESS RIGHTS VIOLATED, REQUIRING RESENTENCING?

III. DID THE TRIAL COURT DENY PETITIONER HIS DUE PROCESS FAIR TRIAL RIGHTS BY INVADING THE PROVINCE OF THE JURY TO DETERMINE FACTS; NOT GRANTING A CHANGE OF VENUE ON ITS OWN MOTION; GIVING IMPROPER OR INCOMPLETE INSTRUCTIONS; ALLOWING PRIOR CONSISTENT STATEMENTS INTO EVIDENCE; NOT PROPERLY CONTROLLING THE PROSECUTOR; AND FAILING TO GRANT DEFENDANT'S MOTION FOR NEW TRIAL AND RESENTENCING?

IV. DID THE PROSECUTOR'S ACTIONS DENY PETITIONER A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE FEDERAL CONSTITUTION?

V. IS THE RIOT STATUTE UNCONSTITUTIONAL BECAUSE IT IS TOO VAGUE?

VI. SHOULD PETITIONER [] GET A NEW TRIAL BECAUSE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL?

VII. DID THE JUDGE ERR BY FAILING TO GRANT THE MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE?

VIII. IS PETITIONER'S SENTENCE INVALID DUE TO IMPROPER SCORING OF THE SENTENCING GUIDELINES THAT HAD BEEN PREPARED AS (WITH INTENDED SUBSTANCE) AN AID TO REFLECT COMPLETE ACCURACY FOR THOSE WHO USE THE GUIDELINES ENACTED BY THE LEGISLATION OF MICHIGAN, IN WHICH [SIC] IS TO COMPORT EXACTLY WITH THE LAW; BURDEN OF PROOF (USED INCORRECTLY), THEREFORE, HIS DUE PROCESS RIGHTS WERE VIOLATED, THEREBY, REQUIRING RESENTENCING?

(Br. in Supp. of Pet. at ix, docket #2.)  Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied because they are either procedurally defaulted or have no merit.  Upon review and applying the AEDPA standards, I find that all grounds are either without merit, procedurally defaulted or noncognizable.  Accordingly, I recommend that the petition be denied.

<u>**Procedural History**</u>

**A.      Trial Court Proceedings**

The state prosecution arose from a shooting incident on March 28, 2004, which occurred during the course of a riot.  Petitioner was charged with assault with intent to murder, rioting, and felony-firearm.  Following a preliminary examination on April 13, 2004, he was bound over on all charges.  A supplemental information was filed charging petitioner as a habitual offender, fourth offense.  Petitioner was tried before a jury beginning September 7, 2004, and concluding on September 8, 2004.

Benton Harbor Police Chief Samuel Harris testified that he was called to duty at about 8:00 p.m. on March 28, 2004, because of large disturbance occurring in the area where Broadway and Columbus Streets meet Empire Street.  (Tr. I, 108-09.)  When he arrived at Broadway and Empire, a number of police departments had assembled, including the Michigan State Police, the Berrien County Sheriff Department, the St. Joseph Police Department, the St. Joseph Township Police, and police from Watervliet and Coloma, as well as some others he could not recall.  (Tr. I, 109.)  When he arrived, there was a crowd of 300-400 people who were throwing bottles and other objects into the air.  (Tr. I, 109-10.)  Only three or four Benton Harbor officers were on duty at that time.  (Tr. I, 110.)  When he arrived, he asked again for as much assistance as he could get from the surrounding police departments.  Captain Alan Mingo of the Benton Harbor Police also arrived.  They divided the police into two groups of five or six officers, each group taking one side of Empire Street, and they began walking east on Empire from Broadway.  (Tr. I, 112.)  Harris testified that he was in plain clothes, but wearing a bullet-proof vest with the word "Police" in reflective materials on the chest and rim.  Other officers had helmets, but most had no riot gear.  Officers were armed

with shotguns and sidearms. Officers were ordered not to use their weapons except in extreme circumstances that threatened life. (Tr. I, 113-14.) Harris used the loud speaker on his vehicle to order the crowd several times to disperse and go home. The officers then began a sweep of Empire Street. The crowd moved but did not disperse. The crowd was hostile, throwing bottles and other objects at the officers. (Tr. I, 114.) Once the officers had gone several blocks, past Columbus Street, they turned and began moving the opposite way on Empire, toward Broadway. (Tr. I, 115.) As they moved, the officers continued to give verbal orders to leave the street, go home, etcetera. (Tr. I, 115.) When the five or six officers with Harris reached Columbus Street, they saw a large crowd, a couple of hundred people, on the south side of Columbus. They began to assemble to sweep south on Columbus. (Tr. I, 115-16.) People were throwing bricks and bottles toward the police. (Tr. I, 116.) The officers formed a line across the street and attempted to move forward. Instead of moving back, the crowd began to come in the officers' direction. (Tr. I, 117.) Harris fired one round from his shotgun into the air. (Tr. I, 118.) The crowd began to run, and, as they ran, Harris heard several shots from a weapon. (Tr. I, 118.) The shots sounded like they came from a handgun that was about 30 feet in front of the officers. (Tr. I, 118-19.) Harris could not see who fired the shots. (Tr. I, 119.) The shots were fired almost immediately after Harris fired the shotgun. (Tr. I, 120.) Harris checked to see if any of his officers was injured. (Tr. I, 120.) The officers began to advance again. (Tr. I, 120.) A group of people ran up to the officers saying that a person had been shot and needed assistance. The officers immediately moved to the location of the gunshot victim. (Tr. I, 121.) They found the victim in the grass area in front of a house. She was screaming and someone was attempting first aid by placing a tourniquet on the wrong side of the wound. (Tr. I, 122.) Harris stopped the tourniquet attempt. They called for medical assistance, which arrived within five

minutes. The victim was a black female with closely cropped blonde hair. (Tr. I, 123.) The victim was transported very soon thereafter, given the nature of her wound. (Tr. I, 124.) The officers asked the crowd to leave, and they began to disperse. (Tr. I, 124.) After the crowd began to settle and disperse, the officers moved back to Empire and Broadway. Harris sent some cars out to patrol the area. (Tr. I, 125.) A total of 20 to 25 officers were present that evening. (Tr. I, 126.)

Roshanda Robinson testified that, on March 28, 2004, she was out walking when she got shot. (Tr. I, 133.) She was with Tina Wade, Angela Hubert and Nikki Stewart. (Tr. I, 134.) They walked from Angela Hubert's house on Hastings to Broadway. (Tr. I, 134.) They passed Broadway and went down Empire. They were standing by Empire between Pearl and Columbus. (Tr. I, 135.) They were hanging out and talking. It was nice outside and a lot of people were walking. The four women were going to a barbeque on Columbus. (Tr. I, 135.) As they walked toward the place she was shot, she saw about 50 or 100 people standing and talking. When they arrived at the location, there were groups of people. She knew many people and spoke with some. (Tr. I, 136.) They stopped on Empire between Pearl and Columbus because a fight had broken out among some girls. (Tr. I, 136-37.) The time was between 8:30 and 8:45 p.m., and it was getting dark. (Tr. I, 137.) Robinson saw a couple of men grab the girls and break up the fight. She did not see the police where the fighting was. (Tr. I, 137.) Robinson heard one shot that was close to them. (Tr. I, 137.) After the fight, she saw police vehicles and about ten to fifteen officers at Empire and Columbus. (Tr. I, 138.) People began to move on the street, but they were still in the streets. (Tr. I, 138.) Robinson was with her friends on Columbus, just inside the alley. (Tr. I, 138, 141.) She saw the police put on the Helmets and black police jacket, and they had shields and guns. (Tr. I, 142.) Robinson testified that she saw people throwing bricks and bottles at cars and police on Pearl

Street, but not at Pearl and Empire and not on Columbus. (Tr. I, 143.) Robinson stated that she had known of and seen a person who went by the street name of "Roland" for two or three years. (Tr. I, 143.) She now knows the person's real name is Willie Joe DePriest. (Tr. I, 144.) She identified Petitioner in the courtroom. (Tr. I, 144.) She saw Petitioner earlier that day near the store at Empire and Broadway called BJ's. (Tr. I, 144.) He was with a group of people, some of whom she knew by their street names of Levar, Glenn and Winnie. (Tr. I, 145-46.) Robinson spoke to Levar. Tina spoke to Petitioner. (Tr. I, 146.) She saw Petitioner later that night on Columbus, after the fight broke up. (Tr. I, 146.) Petitioner was standing with the same people as before. (Tr. I, 147.) Robinson saw Petitioner fire one shot into the air to break up the fight. (Tr. I, 147-48.) Tina Wade then told Petitioner he was crazy. (Tr. I, 147.) Robinson saw Petitioner put the gun back inside the waistband of his pants. (Tr. I, 148.) Robinson again saw Petitioner a bit later, standing by the alley on Columbus. (Tr. I, 149.) He was walking with the same group. He was five to ten feet away from Robinson. (Tr. I, 149.) The police arrived about that time. (Tr. I, 150.) Robinson heard a shot that sounded like a big boom. (Tr. I, 150.) The police started walking toward them, and some shooting started on Columbus. She heard three or four shots. (Tr. I, 150.) She saw Roland shooting. He had fired once in the air, and then both he and Robinson were running. She ran across Columbus, and he shot three more times as he was running backward down Columbus, facing Empire. (Tr. I, 152-53.) Robinson was between Petitioner and the police. (Tr. I, 154.) She felt herself get shot when she was a few feet from Petitioner. She hollered at Tina that she had been shot. (Tr. I, 154.) She ended up in front of one of the houses in a photograph she identified as People's Exhibit 13. She felt the shot when she was about 20 feet from where she ended. (Tr. I, 159.) Robinson testified that the police had asked people to leave earlier, but they did not do so. (Tr. I, 160.) At the time she was

shot, Petitioner did not realize he had hit her. Robinson spoke with Petitioner a couple of days later, when he called on her cell phone. (Tr. I, 160.) He told her that he didn't shoot her, and he was upset that the police had been to his aunt's house. (Tr. I, 161.) She told him she did not feel like talking and hung up. She did not pick up when he called back a couple more times. (Tr. I, 161.) She knew the follow-up calls were from Petitioner because the calls came up "private," that is, they did not show a number on the caller ID. (Tr. I, 161, 173.) During his call, Petitioner told Robinson that she had been "shot with a 9" and that he had a 357. (Tr. I, 161.) Robinson testified that she had no doubts that it was Petitioner who shot her. (Tr. I, 161.) She testified that she did not have any trouble with Petitioner before the incident. (Tr. I, 162.) According to Robinson, she still had trouble with her legs at the time of the trial and that the wound had taken two and one-half months to close. The wound was high on the front of her thigh, near her vagina and stomach. She had two holes in her right leg and two burns in her left leg. (Tr. I, 163.)

On cross-examination, Robinson testified that the crowd had started to riot by throwing bottles and bricks at around 6:00 p.m. She did not participate. (Tr. I, 164.) She did not see Petitioner throw anything. (Tr. I, 165.) At the time of the shooting, she did not see any rioting; she saw only the fight. (Tr. I, 166.) She heard the police fire one shot. She stayed near the tree in the alley. (Tr. I, 166.) After Petitioner fired one shot into the air, the police began coming across the street. (Tr. I, 167.) Both Petitioner and she began running about the same time, and he began shooting. (Tr. I, 167.) She testified that the shot went in the front of her leg and came out the back, and she said that she was sure the shot did not enter from the back. (Tr. I, 168.) She saw Petitioner running and shooting at the same time. (Tr. I, 169.) Robinson denied being mistaken about who was shooting. (Tr. I, 169.) She did not hear Petitioner say anything while he was shooting. (Tr. I, 169.)

However, shortly before the shooting when he was talking to Tina, Petitioner stated that if the "mother fuckers shot tonight, he's shooting back." (Tr. I, 170.)

Angela Hubert testified that she had known Roshanda Robinson for fifteen years. On March 28, 2004, Hubert met up with Robinson, Tina Wade and Nikki Stewart on the corner of Empire and Columbus. (Tr. I, 176.) Hubert had a family dinner and, when she left the dinner, she saw the three on the corner. She talked for awhile and then took her car to her house on Hastings, where she parked. Robinson rode with her in order to use the restroom. They were then dropped off at the same corner to meet up with Wade and Stewart. (Tr. I, 177.) There were about 100 people in the area, and people were fighting and drinking. (Tr. I, 177.) She saw one fight between two girls. While they were fighting, a gunshot went off, and everyone began to run. She wanted all four of them to leave at once, but Robinson and Stewart ran toward Columbus Street. She and Wade walked toward Columbus and tried to get Robinson and Stewart to leave. They ended up standing by the alley on Columbus. (Tr. I, 179.) Hubert testified that she knew who Roland was from living in the area. She identified Petitioner as Roland. (Tr. I, 180.) On the night of the shooting, Hubert first saw Petitioner while she was standing in the alley area. Petitioner came up to talk with a man who was also in that area. Petitioner mentioned having shot the gun to break up the fight. (Tr. I, 180, 184.) Hubert saw Petitioner's gun on his side, under his T-shirt. She urged the others to leave. (Tr. I, 180.) By that time, the police had arrived at the other end of Columbus. (Tr. I, 182.) As the police were gathering at the corner of Empire and Columbus, she heard a big boom. Everyone started running. As they started running, Petitioner took out his gun and started shooting back toward Robinson, Stewart, Wade and herself. The four women were between Petitioner and the police. (Tr. I, 184.) They had hardly left the alley when Petitioner began shooting. Hubert saw

- 8 -

Petitioner fire his gun. (Tr. I, 186.) When he started shooting, Petitioner was firing backwards. (Tr. I, 187, 190. According to Hubert, Petitioner fired at least three or four times. (Tr. I, 190.) Hubert ducked in front of a truck, and Stewart went farther toward her old house. Robinson and Wade went a different way. When Robinson crossed the road, she hollered that she was shot. (Tr. I, 187.) Hubert and Stewart went across the street to where Robinson was. Robinson fell, saying she was shot in the leg. Robinson touched Hubert, leaving blood all over Hubert's shirt. (Tr. I, 187.) A man came out and tried to help Robinson. (Tr. I, 187.) Hubert went to the police chief and told him that someone was shot. He got help and came over to where Robinson was located. (Tr. I, 188.) Wade went somewhere to call for help. (Tr. I, 188.) Hubert spoke with the police chief, who asked whether she knew who did the shooting. (Tr. I, 188.) The ambulance came and transported Robinson to the hospital. Wade rode in the ambulance, and Hubert went to the hospital. (Tr. I, 188.)

Tina Wade testified that she was Roshanda Robinson's sister and she knew Nikki Stewart and Angela Hubert for years. (Tr. I, 199-200.) On the day Robinson was shot, Wade and Robinson had been together, walking Wade's dog and hanging out. It was a nice day, and many other people were on the street. (Tr. I, 200.) They met up with Stewart and Hubert in the evening, before it got dark, near the intersection of Empire and Pearl Streets. They were standing on the corner when the police came and tried to break up the crowd because a few people had started to throw bricks and rocks at cars. (Tr. I, 201.) They seemed to be trying to get others riled up, but few were joining in. (Tr. I, 202.) The police tried to get the crowd to move, but they did not comply. (Tr. I, 202.) People liked to congregate in that area on hot days. (Tr. I, 203.) The police called in more officers. At that point, people began to push toward Columbus and Broadway. (Tr. I, 203.) Before the police arrived, some girls had been fighting near the corner of Empire and Columbus.

(Tr. I, 204.) Wade saw the police, including the police chief, gather at the corner. (Tr. I, 205.) The police chief fired his gun and told the officers, "let's go." (Tr. I, 206.) There were police cars blocking off the street with their lights on. (Tr. I, 206.) She knew that the police wanted them to leave, but she did do so because she did not think she was doing anything wrong. (Tr. I, 207.) Wade testified that she knew a man with the street name of Roland, and she identified Petitioner as Roland. (Tr. I, 207-08.) Wade testified that, after the police chief fired his shotgun, people began to run. She and Robinson ran toward the south. As she ran, she ducked down. She saw Petitioner running about twenty feet from her. She saw him pull out and point his black and silver gun. (Tr. I, 211-12.) He pulled the gun from his left side near his waist. (Tr. I, 212.) Petitioner fired his first shot into the air. (Tr. I, 213.) After that, he pointed his gun in their direction and fired three or four shots. (Tr. I, 213-14.) Robinson cried out that she was shot. Robinson ran a few more steps and then went down on one knee, saying again that she was shot. (Tr. I, 214-15.) Wade testified that she had seen Petitioner earlier in the day, riding around on a truck from the projects. (Tr. I, 216.) She saw him again walking in the area near the alley. He was talking to others and he sounded excited or "hype[d]," like he might have been drinking. (Tr. I, 217.) She spoke to him to say, "Roland you crazy." (Tr. I, 217.) Wade made the comment after overhearing that Roland was the person who had fired a shot when the girls were fighting. (Tr. I, 218.) Roland responded, "I had to break that shit up." (Tr. I, 218.) Wade identified Yolanda Taylor as "Vette," whose house was located right next to where Robinson went down. (Tr. I, 219.) Wade saw Vette that night when the man was trying to give Robinson first aid by wrapping his shirt around Robinson's leg. Vette and a couple of other people were standing in Vette's doorway. Wade approached Vette and asked if she could give Wade a ride because Robinson had been shot. Vette agreed and asked her to wait a minute.

(Tr. I, 219.)  But Vette could not find her keys, so Wade ran through the alley to get her own car, which was parked on Pearl Street.  (Tr. I, 220.)  She returned and then traveled to the hospital in the ambulance with Robinson.  (Tr. I, 220.)  Wade testified that she did not consider the conduct of the crowd to be a riot.  Instead, there was a fight involving young people and several others were throwing objects at the cars.  She defined a riot as like what had happened the previous June in Benton Harbor, when "they tore up the town," burning houses and the like.  (Tr. I, 227.)

Randy Garnett testified that he was a paramedic for Medic One.  (Tr. I, 230.)  On March 28, 2004, he made a run to the 900 block of Columbus in Benton Harbor on a report of a gunshot wound.  It was dusk, and he found a woman lying face down in the front yard of a residence. She had a gunshot wound to her hamstring.  (Tr. I, 230.)  When he and his partner arrived at the street, there were several officers with shotguns, sweeping the crowd.  They were able to park 50 feet from the injured woman.  They got her in the ambulance and transported her within about four minutes.  The victim was in pain and crying, but in control.  (Tr. I, 231.)  Many officers were in the area and police cars were lit up at the end of the street.  (Tr. I, 232.)

Nikki Stewart testified that she had known Roshanda Robinson, Tina Wade, and Angela Hubert her whole life.  Robinson was her cousin and Wade was her god sister. On the date of the shooting, she was with the other women.  (Tr. I, 234.)  Stewart left her own home late in the daylight hours and went to her aunt's house at the corner of Pearl and Empire.  When she arrived, the other three women were already there.  (Tr. I, 235.)  A crowd of people were on the streets of Pearl, Empire and Columbus.  Some were fighting, some watching, and some running.  The women walked from Pearl to Columbus.  (Tr. I, 235.)  Stewart knew quite a few people who were in the streets.  (Tr. I, 236.)  It was getting dark when they arrived in the area of Columbus and Empire.  (Tr.

I, 236.)  The police were already there and were trying to get the crowd to leave.  Part of the crowd

was gradually leaving, but there were fights going on.  (Tr. I, 237.)  The police line, led by the police

chief, began coming from Empire south on Columbus.  (Tr. I, 238.)  When they got to the area of

Columbus south of Empire, four girls were fighting and two crowds had formed.  (Tr. I, 239.)  Wade,

Robinson, Stewart and Hubert were together, and they were planning to leave together.  (Tr. I, 239.)

In fact, they were leaving, but they were going slowly, talking and taking their time.  (Tr. I, 240.)

Stewart testified that she knew Roland, and she identified him in court as Petitioner.  (Tr. I, 240.)

Stewart saw Petitioner on Columbus, and he was walking and talking to Eddy.  Petitioner was

"geeked about something."  (Tr. I, 241.)  Petitioner told Eddy that he just had to break up a fight and

had shot a gun to do so.  (Tr. I, 241.)  She could see the outline of the gun under Petitioner's shirt.

(Tr. I, 241.)  She did not see him talking to anyone else.  (Tr. I, 242.)  She overheard Petitioner

telling Eddy that "when they start shooting, I'm shooting back."  (Tr. I, 243.)  She understood

Petitioner to be referring to the police, who were coming.  (Tr. I, 243-44.)  Stewart had just moved

from the house directly across the street from Vette's.  (Tr. I, 245.)  When she heard the boom of the

police chief's shotgun, she and the others began to run.  Petitioner began to shoot, and Stewart saw

fire coming from the end of Petitioner's black handgun.  (Tr. I, 246, 255.)  Petitioner shot four or five

times while running backward.  (Tr. I, 246, 248.)  Stewart was between the police and Petitioner.

(Tr. I, 249.)  When Stewart saw Petitioner shoot Robinson, Stewart was running at Robinson's right.

She saw Petitioner point his weapon in multiple locations, firing toward Empire.  Stewart knew

immediately that Robinson had been hit on approximately the second shot.  (Tr. I, 249-50.)  She and

Hubert split off and ran behind her old house, trying to get away.  Then they returned to the street

to check on Robinson. (Tr. I, 251.) Stewart remained with Robinson until the ambulance arrived. (Tr. I, 251.)

Benton Harbor Police Officer Corey Peek testified that he worked the 8:00 a.m. to 8:00 p.m. shift on March 28, 2004. According to Peek, it was an eventful day, with large crowds and a shooting during the day. (Tr. I, 257.) Police routinely spent a lot of time in the Empire and Broadway area because groups tended to congregate there. On that day, the weather was very warm, and the groups were a lot larger than normal. (Tr. I, 257.) Starting at about 3:00 p.m., people began to congregate until approximately 100 people were on the street by 6:00 p.m.. (Tr. I, 258, 259.) In order to keep the peace, he and Officer Herman got out of the car and asked people to move off the street and sidewalk so as not to block either. Officers Deenik and Greer also were there. (Tr. I, 258.) The officers were completely unsuccessful in getting people to move off of the streets and sidewalks. (Tr. I, 259.) At about 6:00 p.m., they received a call about girls fighting. They detained two juveniles until their parents showed up. Peek went to the station with the girls. (Tr. I, 260.) He was picked up by Herman at about 7:00 p.m., and they returned to the area. By that time, the crowd had at least doubled, perhaps tripled. (Tr. I, 260.) By this time, two state troopers had arrived. (Tr. I, 260.) The officers stopped in front of a liquor store at Empire and Broadway. (Tr. I, 260.) Rocks and pebbles were falling at their feet. (Tr. I, 261.) They called the county for additional officers. At that point, they decided to block Empire Street between Broadway and Pavone. (Tr. I, 261.) As it began to get dark, numerous police cars arrived from the surrounding municipalities. (Tr. I, 262.) The aggression began to escalate, with more rocks and bottles being thrown. (Tr. I, 262.) The chief of police arrived at approximately the time of the shift change, 8:00 p.m., and the night shift had been directed to go straight to the site. The officers had riot shields and helmets and were carrying

shotguns. (Tr. I, 263.) Just after the new shift arrived, Peek heard approximately four very loud gunshots. (Tr. I, 264.) At that point, a group of about ten officers began to move aggressively forward to disburse the crowd, moving east on Empire from Broadway to Columbus. (Tr. I, 264-65.) The police were able to move the crowd because people were concerned about the gunshots. When they reached Columbus, they determined that none of the officers had been shot. (Tr. I, 265.) They secured the intersection, and about half of the people went south and half north on Columbus. The chief of police then turned south. Between 150 and 250 people were south of Columbus. They were sporadically throwing bottles and rocks at the police and yelling profanities. (Tr. I, 266, 270.) At that point, the gunfire began again, coming from within 100 feet of him. (Tr. I, 266-67.) Peek testified that he was not aware that police had fired a shotgun, though he was told later they had. When they heard the shots, the police dispersed, as did the crowd. (Tr. I, 267.) After the shots stopped, police reformed and started down the street. Shortly thereafter, an older man came up to tell them that a woman had been shot. They moved down the street and found a young woman lying on the ground, screaming in pain. (Tr. I, 268.) The police called for an ambulance and started looking for the person who may have fired the weapon. (Tr. I, 269.) The victim was taken away and the police secured the area. (Tr. I, 270.)

After the jury had been excused for the day, the court considered the prosecutor's proposed instruction for the crime of riot. (Tr. I, 276-77.) The court proposed some changes, which both the prosecutor and defense counsel accepted. (Tr. I., 277-78.) The parties also discussed the charge for assault with intent to kill. (Tr. I, 279-80.)

Registered Nurse Sandra Ann Smith testified that she was on duty in the emergency room at Lakeland Hospital when Roshanda Robinson was brought in for treatment on March 28,

2004. Smith testified that Robinson was very frightened, had difficulty breathing and was bleeding from wounds in her legs. Robinson told Smith that someone was shooting a gun off and she was in the wrong place at the wrong time. Robinson also told Smith that she knew who it was and that the man had told her he would pay her not to tell who shot her. (Tr. II, 6-7.) Robinson had been shot through her right leg and had an abrasion burn across her left front upper thigh. (Tr. II, 7-8.) Smith believed the shot had entered in the back and exited from the front. (Tr. II, 8.) She indicated, however, that she was not able to make the determination of which way the shot had entered. (Tr. II, 9.) The wound was higher on the back than on the front. (Tr. I, 10.)

Alicia Ventress testified she knew a person with the street name of Roland, and she identified Petitioner as Roland. (Tr. II, 12.) In March 2004, Roland stayed at her house from time to time. His girlfriend was Kisha Lewis. (Tr. II, 12.) Ventress remembered the riot that occurred in March 2004, and she was driving in a car with Kisha Lewis and Coltina Atkins during part of the evening, circling the block. They went in the house before it got dark, probably at about 8:00 p.m. (Tr. II, 13-14.) As they circled the block, Ventress saw Petitioner in the area three or four times. He was walking around and talking to his friends. (Tr. II, 14.) Kisha left briefly to go to her aunt's house to get them some food. Ventress saw Petitioner when he came over at about 9:00 p.m. He then spent the night. (Tr. II, 15.) Ventress did not see the gathering of police, any fights or any rocks being thrown. (Tr. II, 16.)

Kisha Lewis identified Petitioner as "Roland" (Tr. II, 18.) She testified that he had been her boyfriend for the last seven months. On March 28, 2004, she was staying with Ventress. The two of them drove around the area of Broadway and Empire and Columbus and Empire on that day. (Tr. II, 19-20.) They stopped to talk with friends, who were among the approximately 150

people in the street.   She saw Petitioner standing and talking to friends in the same spot as they circled the block.   She did not hear any gunshots or see any fights or police while she was outside. (Tr. II, 20.)   They left the house at 7:30 or 8:00 p.m.   A friend called at about 9:00 p.m., asking to be picked up.   They picked her up and went to Lewis' aunt's house to get some food.   When she got back to the house at about 9:30 p.m., Petitioner was there.   (Tr. II, 21.)   She heard that someone had been shooting and that people were running.   She did not tell Petitioner that night that Robinson or any woman had been shot.   (Tr. II, 22.)   Petitioner told Lewis that some people were acting crazy in the 900 block of Columbus.   (Tr. II, 22.)

Benton Harbor Police Officer Andrew Collins testified that he worked second shift on the day of the incident.   When he came to work at 8:00 p.m., he was told to get his things together quickly and head toward the Broadway and Empire area, as the day shift was having problems with crowd fights.   (Tr. II, 25.)   He and Officer Leal arrived from the east.   The officers could see very large crowds from six blocks away.   As the approached, they were instructed by radio to stop at Columbus and Empire and take the block back.   (Tr. II, 26.)   Just as they turned north onto Columbus from Empire, showing lights and sirens, they heard four to six gunshots, but they could not tell what direction the shots came from.   (Tr. II, 26, 37.)   Collins and Leal got out of the vehicle and took cover.   (Tr. 26-27.)   Then they and other officers began to command people to get away from the area.   (Tr. II, 27-28.)   He and Officers Leal, Alsup, Peppers and Dehageen were in the 800 block of Columbus, about 25 feet from the corner of Empire.   (Tr. II, 29.)   He saw five to ten officers walking to the 900 block.   (Tr. II, 29.)   Over 100 people were in the area of Columbus and Empire. The crowd was violent, yelling threats at the officers and throwing bottles against the vehicles trying to get through.   He could hear glass breaking on the vehicles.   (Tr. II, 30.)   At one time, there were

four crowd fights going on at the same time, with at least ten to fifteen people fighting. (Tr. II, 36.)
At that point, Collins heard one large blast followed by another four to six smaller sounding gunshots
that came from the south. (Tr. II, 31.) He took cover briefly and then tried to hold the ground. (Tr.
II, 32.) When they were informed that there was a gunshot victim, they were advised to walk west
toward Broadway. (Tr. II, 33.) Far fewer people were on the street after the gunshots were fired.
(Tr. II, 33.) The officers formed a line and slowly walked the 900 block of Empire three or four
times, looking for evidence. They found none. (Tr. II, 33.) Collins testified that he would not
always expect to find a cartridge casing. If an automatic weapon was used, the empty case would
be ejected. If a revolver was used, the empty casing would have stayed inside the revolver until it
was reloaded. (Tr. II, 35.)

    Sergeant Joel Deenik testified he was a patrol officer on the date of the incident. At
about 3:00 p.m., he began walking in the crowds on Empire between McCalister and Broadway. He
asked the people to be calm, but the crowd was hostile and some people swore at him and threw
some bottles at him. (Tr. II, 39-40.) As it got later in the day, things got more tense. They broke
up more than one fight and the crowd had grown to 300 or 400 people in the Empire and Broadway
area. Officers Deenik, Greer and Robinson were present at the time and tried to disperse the crowd.
They called for additional police assistance sometime between 6:00 and 8:00 p.m. (Tr. II, 40, 42.)
Shortly thereafter, approximately ten units arrived from state, county and other municipal
departments. (Tr. II, 42.) A large group of screaming people began to throw rocks at the police.
They first blocked off the area between Empire and Broadway and Empire and Pavone. (Tr. II, 42.)
When the night shift arrived, Deenik was at Broadway and Empire. After the gunshots went off, the
night shift was pulled to Columbus and Empire. Deenik was ordered by Chief Harris to go with him,

Sergeant Robbins, Officer Peek, Officer Herman, and two Berrien County deputies. They took helmets and shotguns and drove to Columbus and Empire. (Tr. II, 44-45.) As soon as they arrived, additional gunshots went off from further south on Columbus. Deenik took cover behind the vehicle and then began clearing the area. (Tr. II, 45-46.) The crowd on the north side of the intersection were responsive at that time. Multiple earlier efforts to clear the street had been ineffective. Deenik did not see Robinson get shot. He learned of the gunshot victim by radio. (Tr. II, 46-47.) In response to a juror's question, Deenik indicated that, in his personal knowledge, only Columbus Street was searched for evidence. (Tr. II, 49.)

Detective Daniel McGinnis investigated the riot that occurred on March 28, 2004. (Tr. II, 51.) Shortly after the shooting, the victim provided the street name of the person who shot her. He knew the individual with the street name of Roland as Petitioner. McGinnis showed a six-photo lineup to the victim and the witnesses who had accompanied her to the hospital. (Tr. II, 52-53, 54.) The lineup was approved by the prosecuting attorney, a defense lawyer and a judge. The lineup defense lawyer was the attorney who represented Petitioner at trial. (Tr. II, 53.) The pictures were chosen by use of software that matches up descriptors of similar individuals. (Tr. II, 54.) McGinnis testified that each photo in the lineup was shown individually during presentation to any witness. In addition, all witnesses were separated when shown the lineup. (Tr. II, 55.) Roshanda Robinson identified the person shown in photo number five as the perpetrator. Photo number five was a picture of Petitioner. (Tr. II, 56.) Tina Wade and Nikki Stewart also identified Petitioner in the photo array. (Tr. II, 56-57.) Angela Hubert was not shown the lineup that evening. (Tr. II, 57.) McGinnis identified numerous photographs of the area taken a few days after the incident. (Tr. II, 59-63.) Shortly before the trial, additional photographs were taken. (Tr. II, 63-65.) Police began

looking for Petitioner and located him at 3:00 p.m. on March 30, 2004. (Tr. II, 66.) McGinnis testified that Petitioner was not tested for gunshot residue because two days had elapsed since the shooting. (Tr. II, 67.) Police never located the weapon used in the shooting. (Tr. II, 68.) Officers also searched the area to find cartridge cases and bullets from the other rounds that were fired. They found nothing. (Tr. II, 69-70.)

Michigan State Police Detective Sergeant Dale Hinz testified that he was assigned to the Violent Crimes Task Force in Benton Harbor. He assisted with the arrest and interview of Petitioner. (Tr. II, 73-74.) Special Agent Dibrito asked the preliminary questions, and Hinz conducted the actual interview. (Tr. II, 74.) Petitioner was advised of his rights, including his right to remain silent. (Tr. II, 76.) Petitioner told Hinz that he was at a barbeque on March 28, 2004 until about 4:30 p.m., when he left with some friends to walk to BJ's Party Store. (Tr. II, 76.) While there, he met a friend named Shonda, with whom he had casual conversation. Petitioner stated that many people were outside on the street because of the warm spring day. He and Shonda observed a couple of female fights. (Tr. II, 77.) Petitioner also advised that he saw a man known as "Little Willie." Petitioner and Little Willie had had a prior disagreement, and Little Willie motioned that he had a gun in his waistband. (Tr. II, 77.) At some point, the Benton Harbor police stopped a vehicle, and a crowd began to gather. The mood of the crowd changed. (Tr. II, 77.) People began throwing bottles and other things. Petitioner told McGinnis that he saw at least 20 people in the crowd who were carrying pistols. (Tr. II, 78.) Petitioner said he heard a couple of shots that he thought were fired by the police, followed by some additional shots from the crowd. (Tr. II, 78.) Petitioner left the area at that time and went home. Once he arrived home, people began asking if he had shot Shonda. He denied it and did not know why they were asking him that. (Tr. II, 78.)

McGinnis asked Petitioner about the gun he was supposed to have during the incident. McGinnis asked Petitioner to take him to the gun. Petitioner told McGinnis that "he would be a fool to take [McGinnis] to a gun, and tell [him] that it was the gun that was used in [the] incident." (Tr. II, 78.) McGinnis replied that he did not want Petitioner to tell him it was the gun that was used, he only wanted Petitioner to take him to the gun. (Tr. II, 78-79.) Petitioner paused, hung his head for awhile, and then told McGinnis that he did not have a gun on him the night of the shooting. (Tr. II, 79.) Petitioner refused to provide McGinnis with the names of the people he was with when he walked to BJ's. McGinnis asked Petitioner whether he had called Shonda following the shooting. Petitioner said that he called to tell her that he was sorry she had gotten shot. (Tr. II, 79.) He denied apologizing or threatening Shonda. (Tr. II, 79.) When McGinnis told Petitioner that several witnesses had identified him as the shooter, Petitioner stated that Shonda had a lot of friends who would say things for her. But Petitioner had no answer to McGinnis' question about why Shonda would identify him as the shooter. (Tr. II, 80.)

Testifying for the defense, Yolanda Evette Taylor stated that she lived at 932 Columbus and knew Roshanda Robinson. (Tr. II, 86.) The shooting occurred directly in front of her house. (Tr. II, 87.) She was sitting on her stairs and saw Petitioner at the scene and saw Robinson get shot. She denied, however, that Petitioner shot Robinson. (Tr. II, 87.) She described the shooter as brown, light-complected man with a medium build and short hair, wearing a T-shirt and faded blue jeans. (Tr. II, 88.) Taylor heard that, when the police began to come down Columbus Street, they told everyone to go into the house, "cause there was going to be killing tonight." (Tr. II, 88-89.) Taylor testified that everyone was "hanging out" on the street. (Tr. II, 89.) As the police began to come up the street, they shot into the air. Everyone began to run. A large crowd of people

were in front of her house, including Petitioner.  (Tr. II, 89.)  Robinson was one house over.  (Tr. II, 89.)  Petitioner was holding a gun, but he was shooting in the air.  He did not shoot Robinson.  (Tr. II, 90.)  The man who shot Robinson ran off with the rest of the crowd.  (Tr. II, 90.)  Taylor spoke with the police that night and told them that Robinson had been shot in the next yard.  (Tr. II, 91.)  At the time, she denied knowing who shot Robinson.  (Tr. II, 91.)  She testified that she did not see Robinson when she was shot.  Instead, she saw Petitioner when he was shooting, and she saw all of his shots go into the air.  (Tr. II, 92, 99.)  Before the police arrived, Taylor witnessed no throwing of bottles or rocks, saying that the people were "just chilling" until the police fired their shots and started down the street.  (Tr. II, 93.)  Taylor did not want to testify at trial, but did so under a subpoena.  (Tr. II, 91, 94.)  She acknowledged that she also was charged with rioting.  (Tr. II, 94.)  She further acknowledged that she did not describe the alleged shooter to McGinnis until she told him she did not want to testify, just before trial.  (Tr.  II, 96-97.)

David Demetrius Caulton testified that he knew Petitioner and saw him on the evening of March 28, 2004.  He also knew Robinson slightly.  He was not aware Robinson had been shot until later.  (Tr. II, 102.)  He first saw Petitioner in the evening when Caulton was standing on the corner of Empire and Columbus with his aunt, Alexis Williams, who is Petitioner's sister.  (Tr. II, 103.)  Caulton heard only one shot, and then he ran out of there.  (Tr. II, 104.)  When he heard the shot, Petitioner was standing with him, talking.  (Tr. II, 104.)  Caulton never saw anyone with a gun.  (Tr. II, 104-05, 109-10.)  He also did not see any fights or anyone throwing things.  (Tr. II, 109-10.)

Alexis Helena Williams testified that she was Petitioner's sister.  (Tr. II, 111.)  She did not know Robinson.  (Tr. II, 111.)  She heard Robinson got shot on March 28, but she did not see it, despite being in the area of Empire and Columbus.  (Tr. II, 112.)  She saw Petitioner for the

first time that day when she went to get cigarettes before it got dark. He was in a crowd of twenty or thirty people near Columbus and Empire. (Tr. II, 112-13.) She spoke with him for ten minutes. (Tr. II, 113.) She never made it to BJ's Party Store because fights broke out. She began to walk back with Brandy and saw Petitioner again. He told her to go home because the police were shooting. (Tr. II, 114.) She stayed at Empire and Columbus because she wanted to watch. (Tr. II, 115.) Chief Harris came up to them and told them to back up. (Tr. II, 115-16.) She did not leave. She never heard any more shots and did not hear that a woman was shot. She was there for another hour, and she did not see Petitioner shoot at anyone or throw anything. (Tr. II, 116.) She saw a lot of kids throwing things at cars. (Tr. II, 117.) She heard people swearing at the police. (Tr. II, 119.) She never told the police that she was with her brother prior to her testimony in court. (Tr. II, 123.)

Brandy Cornelius stated that she knew Petitioner but not the victim. In the early evening hours on March 28, 2004, she was outside talking with her daughter, a cousin, David Caulton and several other people. There were about 200 people in the street. (Tr. II, 125, 131.) She and Petitioner's sister, Alexis, were walking and ended up at David's house. Then they walked down Empire. She saw Petitioner as it was getting dark. (Tr. II, 126.) She did not see a gun in his possession. (Tr. II, 128.) She remained outside until after the police came and the fighting began on Columbus next to the old fire station. (Tr. II, 126-27.) Cornelius did not see anyone throw anything. (Tr. II, 132.) She heard shooting and people began to run. She worried about her daughter, who was walking to BJ's party store, so David walked her back. (Tr. II, 126-27, 132.) She did not see Petitioner at that time. (Tr. II, 127.) When she reached her aunt's house, she heard that someone had been shot. (Tr. II, 128.) She saw Petitioner later that evening at the Projects. (Tr. II,

129.) Petitioner elected not to testify on his own behalf. (Tr. II, 135-136.) The defense rested. (Tr. II, 134.)

The court discussed jury instructions with counsel. (Tr. II, 136-45.) The defense and prosecution agreed to provide an instruction on the lesser included offense of assault with intent to do great bodily harm less than murder. (Tr. II, 138.) In addition, the parties agreed to the instruction that would be used on the offense of rioting. (Tr. II, 139.)

On rebuttal, Officer Collins testified that, on the evening of the incident, he spoke with Yolanda Evette Taylor, whom he knew. According to Collins, once the disturbance had died down, he went out to collect evidence, doing a sweep of the street. At that point, Taylor and another woman came outside. (Tr. II, 146.) Collins asked Taylor if she knew what had happened. Taylor said that she knew that a lot of people were out on the street. Taylor asked Collins about what had happened, and he told her that a woman had been shot. (Tr. II, 147.) The woman with Taylor said that she had not been present. Taylor gave nonresponsive answers to Collins' questions. When he asked if there was anything that she could tell him about the events, she told Collins that she was not there and did not know what had happened. (Tr. II, 147.) She never gave Collins a description of the shooter or told him that she had seen Petitioner. (Tr. II, 147.)

At the conclusion of trial, on September 8, 2004, the jury found Petitioner guilty of of assault with intent to commit murder, rioting, and felony-firearm. (Tr. 11, 191.) On October 18, 2004, Petitioner was sentenced as a fourth habitual offender to respective terms of 25 to 75 years, 10 to 30 years and 2 years. (Sentencing Transcript, (S. Tr.), 16-17, 19, docket #16; 12/22/05 Cir. Ct. Op. & Ord., docket #19.) The court, however, reduced the maximum term on the assault offense

from 900 to 720 months, due to an erroneous assumption at sentencing. The decision did not affect the minimum sentence. (*Id.*)

On June 6, 2005, Petitioner filed a motion for a new trial and an evidentiary hearing. On October 18, 2005, the trial court held an evidentiary hearing. The court denied Petitioner's motion for new trial in an opinion and order issued December 22, 2005. (*See* Berrien County Docket Sheet, docket #12.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on March 9, 2006, raised the first seven issues raised in his application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #18.) Petitioner filed a *pro per* supplemental brief on appeal, raising his eighth habeas ground, and the brief was accepted for filing on July 13, 2006. (*See* Def.-Appellant's Supp. Br., docket #18.) By unpublished opinion issued on September 19, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 9/19/06 Mich. Ct. App. Opinion (MCOA Op.), docket #18.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same eight claims raised before and rejected by the Michigan Court of Appeals. By order entered May 2, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #19.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.     Sufficiency of the Evidence

Petitioner asserts that the evidence was insufficient to prove that he committed any of the crimes charged.   Specifically, he alleges that the prosecution introduced insufficient evidence of his intent to murder.   He also contends that insufficient evidence showed that he was guilty of rioting.   Finally, he asserts that insufficient evidence of either of the two underlying felonies requires reversal of the felony-firearm charge.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.   *Id.*   Issues of credibility may not be reviewed by the habeas court under this standard.   *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).   Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.   *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals carefully considered the sufficiency of evidence on both the assault-with-intent-to-murder and rioting charges:

> This Court reviews the evidence de novo in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crimes were proven beyond a reasonable doubt.   *People v.*

*Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979); *People v. Oliver*, 242 Mich App 92, 94-95; 617 NW2d 721 (2000). The standard of review is deferential and this Court is required to draw all reasonable inferences and make credibility choices in support of the jury's verdict. *People v. Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000); *People v. Griffin*, 235 Mich App 27, 31; 597 NW2d 176 (1999).

The elements of assault with intent to commit murder are "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v. Abraham*, 234 Mich App 640, 657; 599 NW2d 736 (1999). "The intent to kill may be proven by inference from any facts in evidence."

Viewed in a light most favorable to the prosecution, the evidence indicated that defendant was part of a large, hostile crowd. Shortly before the shooting, a witness saw defendant pull out a black and gray gun, fire it once into the air, and place it back into the waistband of his pants. A witness also heard defendant refer to the police as "motherf\* \* \*ers," and state, "when they start shooting, I'm shooting back." Immediately after the police chief fired his shotgun into the air to attempt to disperse the crowd, defendant fired several shots in the direction of the police. A bullet struck Robinson, who was between defendant and the police. The evidence that defendant had directed obscenities at the police and threatened to shoot them, and that defendant then fired several shots in the direction of the police after the police chief fired his warning shot, was sufficient to support an inference that defendant fired his gun with the specific intent to kill a police officer. Although defendant may not have intended to kill or even shoot Robinson, a person may have the requisite state of mind without directing it at any particular victim. Abraham, supra at 657. The evidence was sufficient to support defendant's conviction of assault with intent to commit murder.

Defendant also argues that there was insufficient evidence to convict him of the crime of riot. MCL 752.541 provides:

> It is unlawful and constitutes the crime of riot for 5 or more persons, acting in concert, to wrongfully engage in violent conduct and thereby intentionally or recklessly cause or create a serious risk of causing public terror or alarm.

Defendant argues that there was insufficient evidence that he acted in concert, or caused public terror or alarm. Under the riot statute, "prohibited conduct includes violent acts that intentionally alarm the public or show a conscious disregard of the risk of alarming the public." *People v. Kim*, 245 Mich App 609, 615; 630 NW2d 627 (2001). The prosecutor need not present lay witnesses who testify to a feeling of alarm or fear. *Id.*

Here, there was evidence that defendant was part of a large, hostile crowd of 300 to 400 people who were throwing rocks and projectiles at passing cars and police officers. The evidence that defendant was part of that crowd, that he fired a gun into the air, that he directed obscenities at and threatened to shoot the police, and that he refused to leave when the police ordered the crowd to disperse, supports an inference that he was acting in concert with the larger, hostile group and shared that group's purpose. *People v. Garcia*, 31 Mich App 447, 454; 187 NW2d 711 (1971). Further, defendant's conduct of firing a gun into the air in a crowd of 300 to 400 people while directing threats at the police and then firing his gun into the crowd, in the direction of the police, rose to the level of creating a serious risk of public alarm. *Kim*, *supra* at 615-616. Thus, there was sufficient evidence to convict defendant of the crime of riot.

(9/19/2006 MCOA Op. at 2-3, docket #18.)

The court of appeals clearly applied the *Jackson* standard in its review of the sufficiency of the evidence. The court set forth the elements of assault with intent to commit murder, focusing on Petitioner's challenge to the second element, the "actual intent to kill." (*Id.*) The court recognized that a jury was entitled to draw reasonable inference from any facts in evidence. *See People v. Abraham*, 599 N.W.2d 736, 745 (Mich. Ct. App. 1999) Further, as the state court noted, Michigan law provides that a person may have the requisite state of mind without directing it at any particular victim. *Id.* at 746. In addressing Petitioner's intent to kill, the court of appeals correctly observed that several witnesses had testified that Petitioner fired several shots in the direction of the police, one of which struck Robinson, who was between Petitioner and the police. (Tr. I, 152-53, 167, 186-87, 213-14, 249-50.) Evidence that Petitioner was firing in the direction of police and others is circumstantial evidence of an intent to kill. *See People v. Thomas*, No. 255126, 2005 WL 1651743, at *1 (Mich. Ct. App. Jul. 14, 2005 (citing *People v. Fletcher*, 679 N.W.2d 127 (Mich. Ct. App. 2004), and *People v. Fennell*, 677 N.W.2d 66 (Mich. Ct. App. 2004)). In addition, witnesses testified that, before the police chief fired his shotgun in the air, Petitioner had threatened to shoot

the police if any shots were fired. (Tr. I, 170, 243.) Taken together, a jury could reasonably infer that Petitioner possessed the requisite specific intent to kill. As a result, the decision of the court of appeals that sufficient evidence supported the necessary intent to kill constituted a reasonable application of established Supreme Court precedent.

The state court's conclusion that constitutionally sufficient evidence supported the rioting charge was equally reasonable. As the state court held, numerous witnesses testified that as many as 300 to 400 people were in the street, throwing rocks and bottles at police officers and at passing cars. (Tr. I, 109-10, 116, 143, 201-02, 227, 258-60, 262, 266, 270; Tr. II, 30, 39-40, 42, 78, 117.) The crowd was hostile, yelling obscenities at police officers and refusing to disperse as ordered. (Tr. I, 114-17, 160, 164, 207, 259; Tr. II, 30, 39-40.) Witnesses reported that multiple fights broke out on the street, and gunshots had been fired nearby. (Tr. I, 136-37, 164, 177, 227, 235, 239; Tr. II, 26, 36, 40, 42.) In this context, evidence of Petitioner's threats to shoot the police, his refusal to leave, and his ultimate firing of his gun toward police officers is more than sufficient to support an inference that Petitioner was acting in concert with the larger group and that he shared the group's purpose.

With respect to the remaining elements of rioting, as set forth by the Michigan Court of Appeals, ample evidence supported the jury's conclusion that Petitioner committed a violent act that "intentionally or recklessly cause[s] or create[s] a serious risk of causing public terror or alarm." MICH. COMP. LAWS § 752.541. The testimony that Petitioner fired into a crowd, toward police, would be sufficient for a reasonable jury to conclude that Petitioner showed a conscious disregard of the risk of alarming the public. *See People v. Kim*, 630 NW2d 627, 631 (Mich. Ct. App. 2001) (holding that the violent throwing of rocks and projectiles at police officers, in the context of a large

rally, was sufficient to support a finding of conscious disregard of the risk of alarm). Further, while the prosecution need not present witnesses who testify to a feeling of alarm or fear, *see Kim*, 630 NW2d at 631, the record is replete with evidence that, when the shooting began, the crowd began running in alarm. (Tr. I, 118, 177, 211-12, 249-51, 265; Tr. II, 89, 126.) The state court therefore reasonably found that sufficient evidence to support the riot conviction.

In sum, the state court's determinations that sufficient evidence supported Petitioner's convictions for assault with intent to commit murder and rioting constituted reasonable applications of established Supreme Court precedent. Because the evidence was sufficient to support the underlying felony convictions, the evidence also was sufficient to support the jury's finding that Petitioner possessed a firearm during the commission of those felonies.

## II. Sentencing

In Grounds 2 and 8, Petitioner challenges the constitutionality of his sentences with respect to the scoring of Michigan sentencing guidelines Offense Variables (OV) 9, 12, 19, and 20.[1] Petitioner makes two basic arguments. First, he contends that his sentences were based on inaccurate information in violation of his right to due process because the sentencing court made erroneous findings on various sentencing variables. Second, he contends that he was unconstitutionally sentenced based on findings of fact found by the court, not the jury, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).

---

[1] Under OV-9, points are assessed for the number of victims. MICH. COMP. LAWS § 777.39. OV-12 involves the number of other contemporaneous felonious criminal acts committed. MICH. COMP. LAWS § 777.42. OV-19 involves the interference with the administration of justice or rendering of emergency services. MICH. COMP. LAWS § 777.49. OV-20 assesses points for the use or threat to use a biological, chemical, radioactive, incendiary or explosive device to commit terrorism. MICH. COMP. LAWS § 777.49a.

The Michigan Court of Appeals thoroughly addressed the applications of the sentencing guidelines under state law, finding that each of the four offense variables challenged by Petitioner were supported by the record before the trial court. In addition, the court rejected Petitioner's claim under *Blakely*, holding that the *Blakely* decision is inapplicable to the Michigan sentencing scheme. (9/19/06 MCOA Op. at 7-8, docket #18.)

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v.*

*Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).  *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (citation omitted).  A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude."  *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984).  *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence.  *Tucker*, 404 U.S. at 444, 447.

Petitioner's sentences clearly are not so disproportionate to the crime as to be arbitrary or shocking.  *Doyle*, 347 F. Supp. 2d at 485.  Further, while Petitioner suggests that he was sentenced on the basis of inaccurate information, he does not identify any factual information before the sentencing court that was materially false.  *Tucker*, 404 U.S. at 447.  Instead, Petitioner merely argues that the court should have come to a different conclusion on the basis of the facts before it.  Such a claim clearly falls far short of the sort of egregious circumstances implicating due process.  As a result, the state-court's rejection of Petitioner's sentence scoring claims was not based on an

unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

Petitioner's claim under *Blakely*, 542 U.S. 296, also is without merit. *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. Nov. 10, 2009) (*Apprendi* line of cases does not apply to Michigan's indeterminate sentencing scheme because judicial factfinding affects only the minimum sentence); *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*. *Blakely,* 542 U.S. at 304-05, 308-09. Because the trial court in the present case sentenced Petitioner well within the parameters of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights. *See Chontos*, 585 F.3d at 1002; *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme). The state court's conclusion that *Blakely* was inapplicable to the Michigan sentencing scheme therefore constituted a reasonable application of established Supreme Court precedent.

As a consequence, I recommend that the court deny habeas relief on Petitioner's second and eighth habeas grounds.

III.    Trial Court Errors Violating Due Process

In his third habeas ground, Petitioner raises a series of alleged trial court errors that he contends deprived him of due process and a fair trial. First, Petitioner argues that the trial court invaded the jury's province by finding facts; specifically, he contends that the court improperly referred during voir dire to the events of March 28, 2004 as a "riot." Second, Petitioner argues that the court should have granted a change of venue on its own motion. Third, he argues that the court gave improper or incomplete instructions. Fourth, the trial court allegedly allowed a prior consistent statement into evidence, in violation of the rules of evidence. Fifth, Petitioner argues that the court erred in not properly controlling the prosecutor. Finally, he alleges that the trial court erroneously denied his motion for new trial and resentencing.

### A.     Reference to rioting

Petitioner argues that the trial court improperly found facts by informing the jury during voir dire that there had been a riot, thereby removing the question from the jury.  The Michigan Court of Appeals concluded that Petitioner had failed to preserve his claim by not objecting to the court's statements at voir dire:

> Next, defendant argues that the trial court improperly informed the prospective jurors during jury voir dire that there had been a riot, which defendant maintains removed from the jury the question whether a riot occurred.  Because defendant did not object to the trial court's statements during voir dire, this issue is not preserved and our review is limited to plain error affecting defendant's substantial rights.  *People v. Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999).  In evaluating the prospective jurors' abilities to properly decide this case the trial court questioned them to determine if they had heard or read about a riot that occurred earlier in the year.  Whether the disturbance at issue could be characterized as a riot was not a principal issue at trial.  Instead, the principal issues involved whether defendant was there, whether he participated, and the extent of his participation.  The court informed the prospective jurors that even "if it's shown that the defendant was there, that's no proof that he participated in a riot or that he assaulted anyone."  Viewing the trial court's statements in context, defendant has not shown a plain error that affected his substantial rights.

(9/19/06 MCOA Op. at 3, docket #18.)  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer*

*v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, although the state court reviewed the issue for plain error, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

Petitioner claims that he should be excused from his default because counsel was ineffective in failing to object to the trial court's remark. In order to excuse a procedural default, a petitioner must demonstrate that the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984). *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell

below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The Michigan Court of Appeals concluded that Petitioner had not demonstrated that counsel was ineffective by failing to preserve the error because Petitioner could not show the necessary prejudice. (9/19/06 MCOA Op. at 6.) Indeed, on plain error review, the court plainly found that the trial court's reference during voir dire was not prejudicial in the context of the case. (9/19/06 MCOA Op. at 3.) As the court of appeals noted, the trial court gave careful instructions that the crime of riot included three elements: (1) that five or more persons including the defendant acted in concert; (2) that they wrongfully engaged in violent conduct; and (3) they intentionally or recklessly caused or created a serious risk of public terror or alarm. (Tr. II, 181.) The trial court expressly instructed the jury that it was the jury's duty to make the determination whether the prosecutor had proved each of the elements of the offense. (*Id.*) The court of appeals' finding that

Petitioner was well supported by the record evidence and the whole of the instructions. The court therefore reasonably applied *Strickland* in finding that Petitioner failed to demonstrate that counsel's performance resulted in an unreliable or fundamentally unfair outcome. Because Petitioner fails to show prejudice, he is barred by his procedural default from habeas review of his claim.

Moreover, even assuming Petitioner had not procedurally defaulted his claim and the court's characterization of the gathering as a riot was of constitutional significance, Petitioner would nevertheless fail to demonstrate error warranting habeas relief. On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. For the same reasons Petitioner fails to demonstrate prejudice sufficient to overcome his procedural default, he fails to demonstrate that the trial court's mention of "riot" had any effect, much less a substantial and injurious effect, on the result. For both reasons, I recommend that Petitioner's habeas claim be denied.

### B. Change of venue

Petitioner argues that the court's improper reference to "rioting" during voir dire was so prejudicial that the trial court should have acted *sua sponte* to order a change of venue. It is a "basic requirement of due process" guaranteed by the right to trial by jury that the "criminally accused [receive a] fair trial by a panel of impartial, 'indifferent' jurors." *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). The Sixth Circuit has recognized the existence of clearly established Supreme Court authority distinguishing between "cases involving presumed prejudice – when the setting of the trial is inherently prejudicial, – and

actual prejudice – when review of both the jury *voir dire* testimony and the extent and nature of media coverage indicates a fair trial was impossible." *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citing, *inter alia*, *Murphy v. Florida*, 421 U.S. 794 (1975), and *Estes v. Texas*, 381 U.S. 532 (1965)); *see also Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), *abrogated on other grounds by Harris*, 212 F.3d at 943. Presumptive prejudice is rare, and occurs only "where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). Where prejudice is not presumed, the court must determine whether actual prejudice exists. *Id.* (citing *Ritchie*, 313 F.3d at 962). The relevant question is whether the jurors swore they could set aside any opinion they might hold and decide on the evidence and whether that claim of impartiality should been believed. *Id.* Petitioner has the burden of demonstrating the existence of prejudice. *Sheppard v. Maxwell*, 384 U.S. 333, 353 (1966).

The state court rejected the claim, as follows:

We likewise reject defendant's unpreserved claim that the jury was so contaminated by the trial court's remarks during voir dire that the trial court should have sua sponte ordered a change of venue. As a general rule, venue in criminal actions is in the county where the violation took place. MCL 600.8312. "The burden rests on the defendant to demonstrate the existence of actual prejudice or the presence of strong community feeling or a pattern of deep and bitter prejudice so as to render it probable that the jurors could not set aside their preconceived notions of guilt, notwithstanding their statements to the contrary." *People v. Harvey*, 167 Mich App 734, 741-742; 423 NW2d 335 (1988). The totality of the circumstances, including the content of news accounts and the voir dire examination transcript, should be evaluated on appeal in deciding whether a defendant was deprived of a fair and impartial trial due to local prejudice." *Id.*

As previously indicated, the trial court's comments and questions during voir dire were not improper. Further, defendant has not provided evidence of adverse publicity. The prospective jurors generally responded that they did not have much information about the events in question. Defendant never requested a change of venue, and defense counsel did not exercise all of his peremptory challenges before

expressing that he was satisfied with the jury. On this record, there is no basis for concluding that a change of venue was warranted.

(9/19/06 MCOA Op. at 3.)

The determination of the court of appeals was patently reasonable.[2] As previously discussed, the trial court's remarks during voir dire, when reviewed in the context of the case, were not prejudicial. As a result, on their own, the remarks could not possibly have been so prejudicial as to warrant a *sua sponte* change of venue. Moreover, as the court of appeals observed, the jurors indicated that both they had little information about the events and that they could objectively decide the case solely on the evidence. (Tr. I, 13-20, 47-48, 51, 54, 55, 58, 60-61, 63, 64-66, 68, 70-74, 77-78, 80.) Further, Petitioner provides absolutely no evidence of adverse pretrial publicity. Nothing about the circumstances suggests that Petitioner's right to a fair trial was jeopardized. As a consequence, the state court's determination that a change of venue was not warranted constitutes a reasonable application of established Supreme Court precedent.

## C. Instructional error

Petitioner next argues that the trial court gave improper or incomplete instructions. Petitioner does not state precisely what instructions should have been given, though he suggests that

---

[2] Because the court of appeals found that Petitioner failed to preserve his venue claim, this issue also is procedurally defaulted. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial in 2004. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437 (6th Cir. 2003); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485. However, where, as here, it is easier to decide the claim on the merits, the Court need not first decided the question of procedural default. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")).

- 41 -

the jury should have been instructed as to the defense theory of the case and should have been given definitions of "acting in concert" and "public terror or alarm."

Because Petitioner made no objection to the instructions, the state court reviewed the jury instructions as a whole for plain error. The court concluded that, under the circumstances of the case, Petitioner had failed to show that there was any plain instructional error. (9/19/2006 MCOA Op. at 3-4.)

Petitioner's claim is again procedurally defaulted, as he failed to make a contemporaneous objection. However, even if the claim were not defaulted, he would not be entitled to relief.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Petitioner fails to demonstrate the necessary unfairness. Petitioner's defense theory was presented to the jury by way of evidence and argument. The court did not repeat either party's theory of the case, and therefore did not favor one side of the case. Moreover, Petitioner's claim that a jury must always be instructed about the defense theory is unsupported by *Cheek v. United States*, 498 U.S. 192 (1991), upon which he relies. In *Cheek*, the Supreme Court held that the trial court committed error when it instructed the jury to disregard the defendant's evidence that he had not

acted willfully in failing to pay his taxes because he truly believed that wages were exempt from income tax. *Id.* at 201-02. According to the Supreme Court, the trial court wrongly instructed Cheek's jury that a good-faith belief must be objectively reasonable in order to negate willfulness. *Id.* at 203.[3] Here, in contrast, Petitioner points to no erroneous instruction given by the trial court that prevented the jury from considering the evidence with respect to his defense. The *Cheek* decision therefore is inapplicable.

Moreover, the trial court's instructions on riot were clear and evenhanded. While Petitioner claims that the terms "acting in concert" and "public terror or alarm" need to be defined for the jury, he makes no proposal as to how they should have been further defined. The court offered to give dictionary definitions of the terms, but defense counsel agreed to the instructions as given. (Tr. II, 139.) Given that the words in issue are in common usage, it is not clear that a dictionary definition would have been helpful to the jury. And Petitioner has not set forth any definitions that would have been more clear. Further, the jury did not indicate that it was confused about the riot instructions. Although the jury asked the court to clarify "intent to kill" for purposes of the assault charge, it did not request additional instruction about the elements of riot. *See* Tr. II, 188-89.) In sum, Petitioner has provided no substantive basis to support his claim of prejudice. He therefore fails to show that the instructions as given deprived him of a fundamentally fair trial.

---

[3] Although the Supreme Court reached its conclusion as a matter of statutory construction, the Court indicated that any other interpretation would raise a serious question under the Sixth Amendment. *Cheeks*, 498 U.S. at 203.

### D. Prior consistent statement

Petitioner complains that the trial court impermissibly allowed the introduction of a prior consistent statement made by Robinson to Nurse Sandra Smith. He alleges that the statement was irrelevant and prejudicial because it amounts to a bolstering of Robinson's trial testimony.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000). Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders*, 221 F.3d at 860.

The state court ruled that Petitioner had failed to preserve his claim by making a contemporaneous objection to the admission of Robinson's prior statement. The court of appeals found that the evidence did not amount to plain error affecting Petitioner's substantial rights. The court held that the evidence was properly admitted under the Michigan Rules of Evidence, noting that Robinson had testified consistently at trial, was subject to cross-examination, and her statement was made immediately after the event.

Petitioner fails to demonstrate that admission of Robinson's prior consistent statement offended a fundamental principle of justice. The United States Supreme Court has never held that the admission of prior consistent statements of a witness violated due process. As a consequence, the Court is barred from granting habeas relief on the claim. *Estelle*, 502 U.S. at 67-68.

Moreover, even if the evidence was improperly admitted, Nurse Smith's testimony that Robinson had recognized the shooter was subject to cross-examination, and Robinson herself was subject to cross-examination about her trial testimony to the same effect. Because Robinson's testimony at trial was entirely consistent with her statement to Smith and consistent with the trial testimony of Wade, Stewart and Hubert, admission of the prior testimony could not have had a prejudicial effect on the jury. Therefore, error, if any, was harmless. *See Brecht*, 507 U.S. 619.

### E. Cumulative error

Petitioner claims that, even if the trial court's errors do not separately require the grant of the writ, the cumulative effect of those errors warrants habeas relief. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not

individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Habeas relief therefore is unavailable on this issue. Moreover, because I concluded above that the individual claims are wholly without merit, Petitioner cannot show that the cumulative error violated his constitutional rights. *See Seymour*, 224 F.3d at 557.

### F.     Denial of motion for new trial

Petitioner argues that the state court erred in denying his motion for new trial. He argues that the verdict was against the weight of the evidence, particularly in light of the prosecutor's admission that Petitioner did not intend to kill Robinson, the person he ultimately shot.

Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68. "[F]ederal habeas corpus relief does not lie for errors of State law." *Estelle*, 502 U.S. at 67 (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The contention that a verdict is against the great weight of the evidence is a state-law argument directed to a defendant's right to a new trial. *See People v. Lemmon*, 576 N.W.2d 129, 133 n.8 (Mich. 1998); *People v. Herbert*, 511 N.W.2d 654, 658 (Mich. 1993). Consequently, a state prisoner's claim that he is entitled to a new trial because the jury verdict was against the great weight of the evidence or because justice has not been done is a state law claim not cognizable on federal habeas review. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985) ("[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence"); *Cukaj v.*

*Warren*, 305 F. Supp.2d 789, 796 (E.D. Mich. 2004) (federal courts have "no power to grant habeas relief on a claim that a state conviction is against the great weight of the evidence").

Alternatively, Petitioner contends that he should be granted resentencing because his sentence was disproportionate to the offense. To the extent Petitioner argues that his sentence was disproportionate under *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990), he fails to raise a cognizable habeas claim. In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). As previously discussed, a federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. *Bradshaw*, 546 U.S.at 76; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action.

Moreover, Petitioner's sentence fails to implicate the Eighth Amendment. The Eighth Amendment does not require strict proportionality between a crime and its punishment. *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S.

11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)).  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin*, 213 F.3d at 302 (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *Thomas*, 49 F.3d at 261.  Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law.  Petitioner's sentence therefore does not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment.

IV.     Prosecutorial Misconduct

In his fourth ground for habeas relief, Petitioner argues that the prosecutor denied him his right to a fair trial in violation of the Due Process Clause.  Petitioner makes several distinct claims.  First, he alleges that the prosecutor deliberately elicited a variety of irrelevant and highly prejudicial information.  Second, Petitioner argues that his statement made to the police was irrelevant hearsay because he made no admission against his own interest.  Third, Petitioner contends that the prosecutor interjected his personal beliefs into his argument.  Fourth, Petitioner claims that the prosecutor misstated the law.  Fifth, he alleges that the errors, considered cumulatively, were sufficient to amount to prosecutorial misconduct.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Michigan Court of Appeals conducted a lengthy and thorough examination of each of Petitioner's arguments concerning prosecutorial misconduct:

> Defendant next argues that the prosecutors conduct denied him a fair trial. Prosecutorial misconduct issues are decided case by case. *People v. Abraham*, 256 Mich App 265, 272-273; 662 NW2d 836 (2003). This Court considers the prosecutor's conduct in context to determine whether it denied the defendant a fair and impartial trial. *People v. Reid*, 233 Mich App 457, 466; 592 NW2d 767 (1999). Here, however, defendant did not object to most of the matters that he complains of on appeal, limiting our review of those issues to plain error affecting defendant's substantial rights. *Carines, supra*.

> Defendant first argues that the prosecutor elicited irrelevant and prejudicial evidence. Specifically, he challenges Benton Harbor Detective Sergeant McGinnis's testimony that he developed a suspect and went to talk to defendant, that he obtained a photo of defendant already on file, that defendant was identified from a photo lineup (identifying the photos actually used), and that he attempted to locate and arrest defendant two days after the shooting (to explain why gunshot residue testing was not done).

> It was defendant's theory that he did not shoot Robinson and that the eyewitness identifications were either mistakes or lies. A defendant's general denial

places each element of the charged offense at issue. *People v. Sabin (After Remand)*, 463 Mich 43, 60; 614 NW2d 888 (2000). Because the identity of the shooter was a principal issue at trial, the evidence regarding the police investigation that led to defendant's identification, and the explanation for why a gunshot residue test was not conducted, were all relevant matters. MRE 401. In addition, defendant's flight from the scene and unwillingness to come forward, and his phone call to Robinson, were all relevant to his possible consciousness of guilt and intent. "Evidence of an attempt to avoid arrest and flight in a criminal case is relevant, material, admissible, and can lead to an inference of guilt." *People v. Biegajski*, 122 Mich App 215, 220; 332 NW2d 413 (1982).

Detective McGinnis's testimony about having a file photo of defendant was volunteered in response to the prosecutor's proper question about what McGinnis did to identify whether defendant was the person identified by the victim and witnesses, as was Detective Hinz's remark about defendant's "previous dealings" with law enforcement, which was given in response to the prosecutor's proper question inquiring into what the detective told defendant "about the case at this point." Not every instance of mention before a jury of some inappropriate subject matter warrants a mistrial, and "an unresponsive, volunteered answer to a proper question is not grounds for granting of a mistrial." *Grifin, supra* at 36. To the extent that these answers referred to improper topics, they were brief, they were not emphasized, and no further inquiry into the improper matters was conducted. The answers did not result from improper questioning by the prosecutor and, under the circumstances, did not deny defendant a fair trial.

Defendant also argues that the prosecutor made improper remarks in her closing argument. We find no merit to defendant's claim that the prosecutor improperly gave personal opinions and referred to matters not supported by the evidence when she stated that defendant was filled with anger and hatred of the police, that he decided to shoot at the police, that he shot directly at the police intending to kill, and that he was acting in concert with the crowd to cause public terror and alarm. A prosecutor is afforded great latitude in closing argument. *People v. Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). A prosecutor may draw inferences from the testimony and may argue that a witness, including the defendant, is not worthy of belief. *People v. Buckey*, 424 Mich 1, 14-15; 378 NW2d 432 (1985). Here, the prosecutor's remarks amounted to fair inferences from the evidence that defendant was part of a crowd that was throwing rocks and bottles and swearing at the police, that defendant referred to the police officers with obscenities, that defendant announced his intention to shoot if the police fired, and that defendant fired a gun through a crowd of people in the direction of the police.

Defendant also contends that the prosecutor misstated the law and undermined the concept of reasonable doubt during voir dire when she said that it

was the jurors' duty to resolve any conflicts. The prosecutor suggested to the jury that, while some people do not know how to approach conflicting evidence, it was a jury's duty to decide evidence and, "if there are conflicts you talk about them and you decide what you believe instead of just throwing up your arms and saying I don't know, I don't really want to decide." The trial court properly instructed the jury regarding reasonable doubt, that it was the jury's job to decide the facts, and that the statements of counsel were not evidence. The prosecutor's remarks, considered in context, were not improper.

Defendant next argues that it was improper for the prosecutor to argue in closing argument that defendant acted in concert with other people in the crowd where there was no evidence of any agreement. The prosecutor only reminded the jury of evidence that 300 to 400 people were in the area, throwing rocks and bottles at the police and at passing cars, yelling obscenities at the police, and behaving aggressively and violently. There was evidence that the crowd of people, including defendant, did not back down when the police attempted to disperse them, but rather continued to move toward the small group of police officers who were attempting to control the crowd. The argument that defendant acted in concert with others in the crowd was a reasonable inference from the evidence. *Buckey, supra*.

Defendant also argues that it was improper for the prosecutor to suggest that the jury could determine defendant's intent to kill from his use of a gun. "The intent to kill may be proven by inference from any facts in evidence." *Abraham, supra*. In this case, there was evidence that defendant fired a gun several times into a crowd, in the direction of the police. Contrary to what defendant argues on appeal, the prosecutor did not argue that the use of a gun automatically established intent to kill, and the argument that the use of a gun could be considered in determining defendant's intent was not improper.

(9/19/06 MCOA Op. at 4-6.)

The state court correctly recited and applied the appropriate constitutional standard.[4]

The court also properly identified the relevant facts on the record and applied them to the *Darden* standard. I have reviewed the court of appeals' extensive and persuasive discussion on each of the claims and conclude that all determinations are fully supported. Upon review, I conclude that the

---

[4] The Court notes that the claims to which Petitioner failed to object appear procedurally default, as the court of appeals relied on the contemporaneous-objection rule and reviewed the questions for plain error affecting substantial rights. Because the matters are easily disposed of on the merits, I decline to address the procedural default. *See Hudson*, 351 F.3d at 216; *Lambrix*, 520 U.S. at 525.

court of appeals correctly rejected each of Petitioner's arguments regarding prosecutorial misconduct.

Moreover, although the state court did not separately address Petitioner's argument that his own statement was inadmissible, the claim lacks merit on *de novo* review. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts). As previously discussed, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. Finally, as I previously stated, Petitioner's claim of cumulative error is not a proper basis for habeas relief. *See Scott*, 302 F.3d at 607. The state court's determinations were neither contrary to nor an unreasonable application of established Supreme Court precedent.

V.     <u>Riot Statute – Unconstitutionally Vague</u>

Petitioner argues that the state riot statute is unconstitutionally vague. Michigan law defines the crime of riot as follows:

> It is unlawful and constitutes a crime of riot for 5 or more persons, acting in concert, to wrongfully engage in violent conduct and thereby intentionally or recklessly cause or create a serious risk of causing public terror or alarm.

MICH. COMP. LAWS § 752.541. Petitioner contends that the statute leaves undefined what constitutes "violent conduct," "public terror," "and public alarm."

A law or regulation can be deemed unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." *Connally v.*

*Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). A statute is unconstitutionally vague under the Due

Process Clause when it fails to "define the criminal offense with sufficient definiteness that ordinary

people can understand what conduct is prohibited, or is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

(2008); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Kolender v. Lawson*, 461

U.S. 352, 357 (1983). However, it is well-settled that a party whose conduct is legitimately regulated

by a statute or regulation lacks standing to challenge it on the basis that it is unconstitutional as

applied to others. *See, e.g., Parker v. Levy*, 417 U.S. 733, 755-57 (1974) (concluding that where

appellee knew that his public statements violated the regulations in question, he had no standing to

challenge them as unconstitutionally vague); *United States v. Paul*, 551 F.3d 516, 525 (6th Cir.

2009) (rejecting challenge to constitutionality of child pornography statute); *United States v. Hill*,

167 F.3d 1055, 1064 (6th Cir.1999) (finding that defendant had no standing to argue that gambling

statutes were void for vagueness where he had fair notice that his conduct was prohibited by those

statutes).

      The court of appeals held that Petitioner had failed to preserve his claim because he

had not objected to the constitutionality of the statute. His claim therefore appears procedurally

barred. Regardless, however, the claim is without merit. As the court of appeals held, the Michigan

courts previously have upheld the statute against challenges for vagueness in *People v. Garcia*, 187

N.W.2d 711, 715-16 (Mich. Ct. App. 1971), and *Kim*, 630 N.W.2d at 32-33. In *Garcia*, the

defendant challenged virtually every phrase of the statute. *Garcia*, 187 N.W.2d at 715. The court

summarily concluded that the only phrase that could possibly be subject to misinterpretation was

"causing public terror or alarm." *Id.* Applying the constitutional standard of review, the *Garcia*

court expressly concluded that the phrase and the statute were "sufficiently clear that men of average intelligence would not have to guess as to its meaning nor differ as to its application." *Garcia*, 187 N.W.2d at 715. The court found that "public terror or alarm" would be caused "any time a segment of the public is put in fear of injury either to their persons or their property," and concluded that the provision gave adequate guidance about what constituted the crime of riot. *Id.*

In *Kim*, the court held that *Garcia*, 187 N.W.2d at 715, remained good law after the Supreme Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). As the *Kim* court recognized, *Claiborne Hardware* extended First Amendment protection only to nonviolent elements of certain boycott activities. *See Kim*, 630 N.W.2d at 619. The *Claiborne Hardware* Court did not disturb its prior conclusion that when such activities turned violent, they no longer were protected First Amendment conduct. *See Kim*, 630 N.W.2d at 619 (citing *Grayned*, 408 U.S. 104) (holding that peaceful demonstrations are protected by the First Amendment, though they lose that protection when they turn violent)).

As the state courts recognized, there can be little doubt that the statute describes prohibited conduct in terms that a reasonable person would understand. Here, the firing of multiple shots into a crowd undoubtedly was violent conduct, and there is little doubt that such conduct reasonably could be expected to – and did – trigger public terror or alarm. Further, as I previously noted, the statute employed terms in common usage, and ample evidence existed for the jury to conclude that Petitioner had acted in concert with at least five others who were behaving violently and aggressively toward the police. The court of appeals' conclusion that the riot statute was not unconstitutionally vague therefore constituted a reasonable application of established Supreme Court precedent.

VI.    Ineffective Assistance of Trial Counsel

Petitioner contends that he is entitled to a new trial because of the ineffective assistance of trial counsel.  He raises three separate bases for his claim.  First, he suggests that, to the extent that his claims were deemed unpreserved for lack of a contemporaneous objection, the ineffectiveness of counsel should excuse his default.  Second, he argues that counsel was ineffective in failing to move for a change of venue or to request sequential questioning of the jury.  Third, he complains that his statement about shooting back at the police should have been suppressed as hearsay that was highly prejudicial.

As previously discussed, to establish a claim of ineffective assistance of counsel, the petitioner must prove the following two elements: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland*, 466 U.S. at 689.

Petitioner's first argument has previously been considered by the Court.  To the extent that I have found Petitioner's claims to be procedurally defaulted, I already have considered whether the ineffective assistance of counsel constituted cause excusing the default.  In other instances, I have addressed the issue on the merits notwithstanding the default.   In those circumstances, the ineffectiveness of counsel is irrelevant.

Petitioner next asserts that his attorney was ineffective in failing to move for a change of venue after it became obvious that the jurors felt that a riot had occurred.  In support of his claim, Petitioner points to nothing in the record that would demonstrate that the jury had reached such a conclusion.  Indeed, as the state court noted and I previously discussed, the record from the *voir dire* demonstrates that the jury had very little information about the incident and that none of the jurors

had formed any opinion as to any of the charges. (*See* Tr. I, 13-20, 47-48, 51, 54, 55, 58, 60-61, 63, 64-66, 68, 70-74, 77-78, 80.)

Petitioner fails to meet either prong of the *Strickland* standard. As discussed in Section III(B), *supra*, Petitioner fails to demonstrate that the jury was biased by media coverage or other taint so as to warrant a change of venue. *See Ritchie*, 313 F.3d at 952 (citing *Murphy*, 421 U.S. 794, and *Estes*, 381 U.S. 532); *Goins*, 605 F.2d at 951 (citing *Irvin*, 366 U.S. 717). Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007). Moreover, because the record contained no evidence of bias, any objection undoubtedly would have been futile. As a consequence, Petitioner's second claim of ineffective assistance of counsel is meritless.

Finally, Petitioner contends that his attorney erred by failing to move to suppress his statement about shooting back. The state court addressed the issue as follows:

> Defendant also argues that counsel was ineffective for failing to move to suppress testimony that witnesses heard defendant say that he would shoot back if the police started shooting. Defendant argues that these statements should have been suppressed because they constituted prior bad acts evidence subject to exclusion under MRE 404(b), did not accurately reflect what he actually said, were inconsistent with evidence that he did not shoot at the police but only shot into the air, and were hearsay. There is no merit to these arguments. Defendant's own statements were admissible under MRE 801(d)(2). Further, the statements were directly related to the charged offenses and, therefore, were not evidence of "other" or "similar" crimes or bad acts under MRE 404(b)(1). Finally, the question whether the witnesses' testimony accurately revealed what defendant said was a matter for the jury. For these reasons, we find no merit to defendant's claims that defense counsel was ineffective.

(9/19/06 MCOA Op. at 6.)

The state court's determination was patently reasonable. Absolutely no state or federal principle bars the admission of a defendant's own statements against interest. Any motion to suppress would have been frivolous. Petitioner therefore has failed to demonstrate that trial counsel's failure to file such a motion was either unreasonable or prejudicial.

I therefore recommend that Petitioner's sixth habeas ground be denied.

VII. Failure to Grant New Trial Based on Newly Discovered Evidence

In his seventh ground for habeas relief, Petitioner argues that the trial court should have granted his motion for new trial on the basis of newly discovered evidence provided by Travis Burton. Burton testified at the evidentiary hearing held October 18, 2005 that the shooting had been committed by Steve Man, who had subsequently died. (Evid. Hr'g Tr., docket #17.) The trial court rejected Petitioner's request, and the court of appeals upheld the decision as follows:

> Next, defendant argues that the trial court erred in denying his motion for a new trial on the basis of newly discovered evidence. We review the trial court's decision for an abuse of discretion. *People v. Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). At an evidentiary hearing, Travis Burton testified that a person who is now deceased shot Robinson. The trial court found Burton's testimony suspect, and cumulative to evidence already presented at trial.
>
> "For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. *Id.* We agree that evidence that defendant was not the shooter was cumulative of other testimony presented at trial, which was rejected by the jury. In addition, Burton testified that he was with defendant at the time of the shooting, that they had a conversation, and that defendant knew he was there. Defendant failed to show that he could not have discovered and produced this witness using reasonable diligence. The trial court did not abuse its discretion in denying defendant's motion for a new trial.

(9/19/2006 MCOA Op. at 7.)

Petitioner fails to state a constitutional basis for his claim. To the extent that he relies on Michigan law, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.

Moreover, to the extent that Petitioner implies that his claim is of constitutional dimension because he is actually innocent of the offense, his claim also must be denied. The Supreme Court never has recognized that actual innocence constitutes a free-standing basis for habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.") This Court may grant habeas corpus relief only when the state court has violated or unreasonable applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (reiterating that free-standing claims of actual innocence are not cognizable on habeas corpus review) (citations omitted).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: June 30, 2010                           _/s/ Ellen S. Carmody_____
                                                  ELLEN S. CARMODY
                                                  United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).